EXHIBIT B

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | **CHAPTER 11** |
| | § | |
| **VMW INVESTMENTS, LLC and** | § | **CASE NO. 19-42644** |
| **VMW BEDFORD, LLC,**[1] | § | |
| | § | **(Jointly Administered)** |
| **Debtors.** | § | |

**DECLARATION OF KARTHIK V. GURUMURTHY IN SUPPORT OF DEBTORS' EMERGENCY APPLICATION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE EMPLOYMENT AND RETENTION OF LARX ADVISORS, INC. TO PROVIDE A CHIEF RESTRUCTURING OFFICER AND ADDITIONAL PERSONNEL, AND (II) DESIGNATING KARTHIK V. GURUMURTHY AS CHIEF RESTRUCTURING OFFICER *NUNC PRO TUNC* TO JULY 31, 2019**

Pursuant to 28 U.S.C. § 1746, I, Karthik V. Gurumurthy, declare as follows:

1. I am a Director at Larx Advisors, Inc. ("Larx"). Except as otherwise noted, I have personal knowledge of the matters set forth herein, and if called and sworn as a witness, I could and would testify competently thereto.

2. I make this Declaration ("Declaration") in support of *Debtors' Emergency Application for Entry of an Order (I) Authorizing the Employment and Retention of Larx Advisors, Inc. to Provide a Chief Restructuring Officer and Additional Personnel, and (II) Designating Karthik V. Gurumurthy as Chief Restructuring Officer Nunc Pro Tunc to July 31, 2019* (the "Application").[2]

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: VMW Investments, LLC (Case No. 19-42644) [7172] and VMW Bedford, LLC (Case No. 19-42646) [0368]. The Debtors' address is 808 W. Indiana Ave., Midland, Texas 79701.

[2] Capitalized terms used but not otherwise defined in this Declaration shall have the meanings ascribed to them in the Application.

**A. Larx's Qualifications**

3. The Debtor has selected Larx based on its experience and expertise in providing restructuring services throughout the country and based on Larx's familiarity with the Debtor's business.

4. Larx specializes in interim management, crisis management, turnaround consulting, operational due diligence, creditor advisory services, and financial and operational restructuring. Larx's debtor advisory services have included a wide range of activities targeted at stabilizing and improving a company's financial position, including developing or validating forecasts, business plans and related assessments of a business's strategic position; monitoring and managing cash, cash flow and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages, including plans involving restructurings, asset sales pursuant to section 363 of the Bankruptcy Code, or plans of liquidation.

5. Larx has provided restructuring and financial advisory services to a number of companies including, but not limited to, Mayflower Communities, Inc. d/b/a The Barrington at Carmel, SQLC Senior Living Center at Corpus Christi, Inc. d/b/a Mirador, Jones Companies, Yak Mat, BluRoc, WCS, Valuepart Incorporated, and New South.

**B. Scope of Services**

6. Subject to approval by the Court, the Debtors propose to retain me as CRO on the terms and conditions set forth in the Engagement Letter attached hereto as Exhibit 1, except as otherwise explicitly set forth herein or in any order granting the Application.

7. Among other things, I will serve as CRO and shall:

a. Replace TYCG as the property manager for each of the Debtors' three commercial real estate properties and undertake all associated duties;

b. supervise, control, and monitor cash receipts and disbursements;

c. engage potential investors and/or transaction partners;

d. assist the Debtors' retained broker in developing strategies for the lease or sale of Debtors' commercial real estate properties;

e. direct and supervise the formulation of budgets and plans;

f. develop all aspects of financial, operational, and administrative direction and plans;

g. determine, direct, and supervise all other activities and strategies, operations, and plans;

h. act as the Debtors' liaison with creditors and governmental entities;

i. manage the Chapter 11 Cases and administration process; and

j. any additional actions authorized by the Debtors and agreed to by Larx.

**C. Compensation**

8. Larx's compensation for professional services rendered to the Debtors shall consist of (i) hourly compensation at the rates stated in the Engagement Letter; and (ii) the fees owed for services rendered in August, September, and October may accrue in excess of $5,000 per month but the cash paid to Larx shall not exceed $5,000 in those months; (iii) accrued but unpaid amounts owed shall be paid upon availability to do so in any subsequent court-approved budget or upon a successful reorganization or sales process; and (iv) the ability of Larx to request a "success fee" from the Court upon a successful reorganization or sales process.

9. This type of arrangement is consistent and typical of other firms who provide

similar services under similar circumstances. I believe that the fees to be charged by Larx are reasonable, market-based, and designed to fairly compensate Larx for its work. In addition, given the breadth of the services to be provided and the modest monthly fee to be charged in these cases, the proposed success fee is also reasonable under the circumstances.

**D. Disinterestedness**

10. To the best of my knowledge, information, and belief, Larx (a) has no connection with the Debtors, their creditors, other parties in interest, or the attorneys or accountants of any of the foregoing, or any person employed by the Office of the United States Trustee; and (b) does not hold any interest materially adverse to the Debtors' estates.

11. By reason of the foregoing, I believe Larx is eligible for retention by the Debtors pursuant to Bankruptcy Code §§ 105(a) and 363(b), as well as §§ 327 and 328 and Bankruptcy Rule 2014(a) to the extent applicable, and any other applicable Bankruptcy Rules and Local Rules.

12. To the extent Larx discovers any facts bearing on the matters described herein during the period of Larx's retention, Larx will amend and/or supplement the information contained in this Declaration to disclose such facts.

13. I am generally familiar with the Bankruptcy Code and the Bankruptcy Rules, and Larx will comply with them, subject to the Orders of this Court.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: August 1, 2019   By:   */s/ Karthik V. Gurumurthy*
Name: Karthik V. Gurumurthy
Title: Director

EXHIBIT 1

**Larx Advisors, Inc.**
2600 Network Boulevard
Suite 290
Frisco, TX 75034
972.294.5884
www.larxadvisors.com

July 31, 2019

Mr. Michael E. Waters, Owner
c/o Clay M. Taylor (via e-mail)
VMW Investments, LLC
VMW Bedford, LLC
808 W. Indiana Ave
Midland, TX 79701

**Re: Chief Restructuring Officer**

Dear Mr. Waters,

1. **Introduction**

This letter confirms that we, Larx Advisors, Inc. ("Larx"), have been retained by you, VMW Investments, LLC and VMW Bedford, LLC ("VMW" or collectively the "Company") to act as Chief Restructuring Officer and advisor to the Company to provide restructuring, financial, and transaction advisory services (the "Services") as set forth below. VMW has filed for bankruptcy and the Judge Mullin is overseeing the cases (the "Bankruptcy Court"). This retention is subject to Bankruptcy Court approval. This letter of engagement describes the services to be provided (the "Engagement") and – along with the related Standard Terms and Conditions – constitutes the engagement contract (the "Engagement Contract") pursuant to which the Services will be provided.

2. **Scope of Our Services**

On the terms and subject to the conditions of this Agreement, Larx will provide to the Company the following restructuring, financial, and transaction advisory services:

(a) Provide Karthik V. Gurumurthy to serve as Chief Restructuring Officer ("CRO") of the Company which position will be a duly-appointed officer of the Company and a member of the Company's senior executive team;

(b) The CRO will report to you;

(c) The CRO will be responsible for the following:

i) Leading the Company's Restructuring and Transaction Activities - Serve as the Company's designated officer in leading the Company's restructuring and transaction activities, including the services set forth in (d) - (f) below. The CRO will be supported by the Larx team, as well as the Company's legal and other

advisors, to explore, evaluate and analyze the Company's available transaction options.

ii) Equity Advisory - Lead the Company in informing and advising you and/or your designees, on transaction options and recommendations. You are the ultimate decision-making body responsible for determining the transaction path and method of implementation. The CRO will serve as the Company's designated officer responsible for leading the execution of your transaction decisions. The CRO will not serve as a member VMW and will have no voting authority respecting VMW decisions.

iii) Stakeholder Communication - Serve as the Company's designee regarding engagement with internal and external stakeholders, particularly economic stakeholders such as creditors.

d) Larx shall provide the following restructuring and transaction advisory services:

i) Assist in the transitioning from having Ty Commercial Group serve as VMW's property manager;

ii) Larx to handle those same functions at least on an interim basis;

iii) Evaluate whether Larx, as CRO, should continue to fill that role after the initial interim period or whether the Company should offload that function to another company or person;

iv) Advise and assist the Company in connection with the Company's identification, evaluation, development, and implementation of financial restructuring strategies and tactics;

v) Advise and assist the Company in the Company's development of multi-year financial projections and related debt service capacity models, as needed;

vi) Advise and assist the Company in the Company's refinement of its cash management and cash flow forecasting process, including the monitoring of actual cash flow versus projections, as needed;

vii) Advise and assist the Company in connection with the Company's communications and negotiations with other parties, including, but not limited to, secured creditors, lessees, suppliers, and other parties in interest;

viii) Advise and assist management regarding responding to the information requests from the Company's stakeholders and potential capital sources;

ix) Advise and assist the Company in the Company's financial restructuring process, including its implementation of appropriate accounting, financial reporting and operational preparations in advance of any financial restructuring process;

    x) Advise and assist the Company in connection with the Company's preparation of various stakeholder presentations and financial reports required to support stakeholder negotiations and coordination;

xi) Advise and assist the Company in its review and assessment of vendor relationships and other executory contracts;

viii) Advise and assist the Company in the Company's development of a Plan of Reorganization or Plan of Liquidation; and

ix) Perform such other professional services as may be requested by the Company and agreed to by Larx in writing.

Notwithstanding anything to the contrary in this Agreement, the Company agrees that the CRO shall be authorized, in such capacity, to make decisions with respect to implementation of the Services set forth herein, and other such areas as the CRO may identify, in such manner, as the CRO deems appropriate, subject only to the Bankruptcy Court's orders, direction, limitations, and parameters set by you and consistent with the Company's operating agreement and all applicable laws.

In the event there is a disagreement as to any direction, guidance or instruction to be given to Larx in connection with the foregoing Services, Larx shall take such final direction, guidance, and instruction provided by the Court, or if no such guidance is offered or appropriate to seek from the Bankruptcy Court, we shall consult with you on all major decisions.

It is our intention to work closely with you and the Company's other outside advisors throughout the course of this engagement. The Services and compensation arrangements set forth herein do not encompass other financial advisory services not set forth in this Section 2. If the Company and Larx later determine to expand the scope of Services to include other services not otherwise set forth herein, such future agreement will be the subject of a further and separate written agreement of the parties.

**3. Company Information and Reports**

In order to fulfil the Services under this Agreement, it will be necessary for Larx personnel to have access to the Company's facilities and certain of the Company's books, records and reports. In addition, it will be necessary for Larx personnel to have open and ongoing access to, and cooperation from, the Company's management and certain other personnel. Larx will undertake the Services in a manner that will permit the business operations of the Company to proceed in an orderly fashion, subject to the requirements of this engagement. The Company agrees to furnish Larx with such information as Larx reasonably and in good faith believes appropriate for this assignment (all such information so furnished being the "Information"). The Company recognizes and confirms that Larx (i) will use and rely on the accuracy and completeness of the Information and on Information available from generally recognized public sources without independently verifying the same, (ii) does not assume responsibility for the accuracy, completeness or reasonableness of the Information and such other Information, and (iii) will not make an appraisal of any assets or liabilities (contingent or otherwise) of the Company. The Company shall advise Larx promptly upon obtaining any actual knowledge of the occurrence of any event or any other change in fact or circumstance

upon which Larx formed part or all of its opinions, advice, or conclusions, or which could reasonably be expected to result in some or all of the Information being incorrect, inaccurate, or misleading. To the best of the Company's knowledge, the Information to be furnished by or on behalf of the Company, when delivered, will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading.

Larx may submit oral reports highlighting our findings and observations based upon the Services we perform pursuant to this Agreement. Our reports will encompass only matters that come to our attention in the course of our work that we perceive to be significant in relation to the Services. The depth of our analyses and extent of our authentication of the information on which our advice to you will be based may be limited in some respects due to the extent and sufficiency of available Information, time constraints dictated by the circumstances of our engagement, and other factors. We do not contemplate examining any such Information in accordance with generally accepted auditing or attestation standards. It is understood that, in general, we are to rely on Information disclosed or supplied to us by employees and representatives of the Company without audit or other detailed verification of their accuracy and validity. Accordingly, we will be unable to and will not provide assurances in our reports concerning the integrity of the Information used in our analyses and on which our findings and advice to you may be based. In addition, we will state that we have no obligation to, and will not update our reports or extend our activities beyond the scope set forth herein unless you request and we agree to do so.

**4. Fees**

Fees in connection with this Engagement will be based upon the time incurred providing the Services, multiplied by our standard hourly rates, summarized as follows:

| Title | Standard Rates Per Hour (USD) |
|---|---|
| Managing Directors | $375 - $460 |
| Directors | $280 - $315 |
| Managers | $230 - $260 |
| Senior Consultants | $195 - $210 |
| Consultants | $170 - $180 |
| Administrative / Paraprofessionals | $50 |

The fees and costs paid in the months of August through October 2019 will be capped at $5,000, but unpaid fees may be accrued. In addition to the fees outlined above, Larx will bill for reasonable direct expenses which are likely to be incurred on your behalf during this Engagement. Direct expenses include reasonable and customary out-of-pocket expenses which are billed directly to the Engagement such as certain telephone, overnight mail, messenger, travel, meals, accommodations and other expenses specifically related to the Engagement.

Further, the Company agrees that if any of the principals or professionals of Larx are required to testify, other than testimony typically provided by a chief restructuring officer in connection with a bankruptcy filing, at the request of the Company, on the Company's behalf or by legal,

regulatory, administrative, arbitration or judicial order, at any proceeding related to the Services or this Agreement, Larx will be compensated by the Company for our associated time charges at our regular hourly rates, in effect at the time and reimbursed for our reasonable out-of-pocket expenses, including counsel fees. In addition, Larx will be compensated for any time and expense (including, without limitation, reasonable legal fees and expenses) that Larx may reasonably incur in considering or responding to discovery requests or other requests for documents or information in any legal, regulatory, administrative, arbitration or other proceeding as a result of, or in connection with the Services or this Agreement.

**5. Cash on Account, Payment Obligations and Billing**

Upon our installation as CRO, we may cause the Company to forward to us the amount of $5,000, which funds will be held "on account" to be applied to our professional fees, charges and disbursements for the Engagement (the "Initial Cash on Account"). To the extent that this amount exceeds our fees, charges and disbursements upon the completion of the Engagement, we will refund any unused portion. The Company, as allowed by the Bankruptcy Court, agrees to increase or supplement the Initial Cash on Account from time to time during the course of the Engagement in such amounts as the Company and we mutually shall agree are reasonably necessary to increase the Initial Cash on Account to a level that will be sufficient to fund Engagement fees, charges, and disbursements to be incurred.

We will send the Company periodic invoices on a weekly or monthly basis, as requested by the Company, for services rendered and charges and disbursements incurred on the basis discussed above, and in certain circumstances, an invoice may be for estimated fees, charges and disbursements through a certain date. Each invoice constitutes a request for an interim payment against the fee to be determined at the conclusion of our Services. We have the right to apply to any outstanding invoice (including amounts billed prior to the date hereof), up to the remaining balance, if any, of the Initial Cash on Account (as may be supplemented from time to time) at any time subject to (and without prejudice to) the Company's opportunity to review our statements.

The Company agrees to promptly notify Larx if the Company or any of its subsidiaries or affiliates extends (or solicits the possible interest in receiving) an offer of employment to a principal or employee of Larx involved in this engagement and agrees that Larx has earned and is entitled to a cash fee, upon hiring, equal to 150% of the aggregate first year's annualized compensation, including any guaranteed or target bonus and equity award, to be paid to Larx's former principal or employee that the Company or any of its subsidiaries or affiliates hires at any time up to one year subsequent to the date of the final invoice rendered by Larx with respect to this engagement.

Fees and expenses may not be paid without the express prior approval of the Bankruptcy Court. In most cases of this size and complexity, on request of a party in interest, the bankruptcy court permits the payment of interim fees during the case. We understand that the Company is seeking to allow such interim compensation. If the Bankruptcy Court approves such a procedure, we will submit invoices on account against our final fee. These interim invoices will be based on such percentage as the bankruptcy court allows of our internal time charges and costs and expenses for the work performed during the relevant period and will constitute a request for an interim payment against the reasonable fee to be determined at the conclusion of our representation.

**6. Terms and Conditions**

The attached terms and conditions set forth the duties of each party with respect to the Services. Further, this letter and the Standard Terms and Conditions attached comprise the entire Engagement Contract for the provision of the Services to the exclusion of any other express or implied terms, whether expressed orally or in writing, including any conditions, warranties and representations, and supersede all previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether oral or written, regarding the Services.

**7. Conflicts of Interest**

Based on the list of interested parties (the "Potentially Interested Parties"), provided by you, we have undertaken a limited review of our records to determine Larx's professional relationships with the Company.

We will not knowingly accept an engagement that directly conflicts with this Engagement without your prior written consent.

**8. Acknowledgement and Acceptance**

Please acknowledge your acceptance of the terms of the Engagement Contract by countersigning this letter and returning a copy to us at the above address.

If you have any questions regarding this letter or the attached Standard Terms and Conditions, please do not hesitate to contact me at (972) 922-3608.

Yours faithfully,

By: ________________________________

Mr. Todd S. Perry
Managing Partner

Date: __________________________

*Attachments:* *Standard Terms and Conditions*

By: ____________________________________

Mr. Michael E. Waters
Owner, and Sole Managing Member

Date: __________________________

# LARX ADVISORS, INC.

## STANDARD TERMS AND CONDITIONS

The following are the Standard Terms and Conditions on which we will provide the Services to you set forth within the attached letter of engagement with Mr. Waters dated July 31, 2019. The Engagement letter and the Standard Terms and Conditions (collectively the "Engagement Contract") form the entire agreement between us relating to the Services and replace and supersede any previous proposals, letters of engagement, undertakings, agreements, understandings, correspondence and other communications, whether written or oral, regarding the Services. The headings and titles in the Engagement Contract are included to make it easier to read but do not form part of the Engagement Contract. The term "you" or derivatives mean the Company as defined in the Engagement Letter.

**1. Reports and Advice**

1.1. Use and purpose of advice and reports – Any advice given or report issued by us is provided solely for your use and benefit and only in connection with the purpose in respect of which the Services are provided. Unless required by law, you shall not provide any advice given or report issued by us to any third party or refer to us or the Services, without our prior written consent. In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.

**2. Information and Assistance**

2.2. Provision of information and assistance – Our performance of the Services is dependent upon your providing us with such information and assistance as we may reasonably require from time to time.

2.3. Punctual and accurate information – You shall use reasonable skill, care and attention to ensure that all information we may reasonably require is provided on a timely basis and is accurate and complete and relevant for the purpose for which it is required. You shall also notify us if you subsequently learn that the information provided is incorrect or inaccurate or otherwise should not be relied upon.

2.4. No assurance on financial data – While our work may include an analysis of financial and accounting data, the Services will not include an audit, compilation or review of any kind of any financial statements or components thereof. Company management will be responsible for any and all financial information they provide to us during the course of this Engagement, and we will not examine or compile or verify any such financial information. Moreover, the circumstances of the Engagement may cause our advice to be limited in certain respects based upon, among other matters, the extent of sufficient and available data and the opportunity for supporting investigations in the time period. Accordingly, as part of this Engagement, we will not express any opinion or other form of assurance on financial statements of the Company.

2.5. Prospective financial information - In the event the Services involve prospective financial information, our work will not constitute an examination or compilation, or apply agreed-upon procedures, in accordance with standards established by the American Institute of Certified Public Accountants or otherwise, and we will express no assurance of any kind on such information. There will usually be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material. We will take no responsibility for the achievability of results or events projected or anticipated by the management of the Company.

**3. Additional Services**

3.2. Responsibility for other parties – You shall be solely responsible for the work and fees of any other party engaged by you to provide services in connection with the Engagement regardless of whether such party was introduced to you by us. Except as provided in this Engagement Contract, we shall not be responsible for providing or reviewing the advice or services of any such third party, including advice as to legal, regulatory, accounting or taxation matters. Further, we acknowledge that we are not authorized under our Engagement Contract to engage any third party to provide services or advice to you, other than our agents or independent contractors engaged to provide Services, without your written authorization.

**4. Confidentiality**

4.2. Restrictions on confidential information – Both parties agree that any confidential information received from the other party shall only be used for the purposes of providing or receiving Services under this or any other contract between us. Except as provided below, neither party will disclose the other party's confidential information to any third party without the other party's consent. Confidential information shall not include information that:

4.2.1. is or becomes generally available to the public other than as a result of a breach of an obligation under this Clause 4.1;

4.2.2. is acquired from a third party who, to the recipient party's knowledge, owes no obligation of confidence in respect of the information; or

4.2.3. is or has been independently developed by the recipient.

4.3. Disclosing confidential information – Notwithstanding Clause 1.1 or 4.1 above, either party will be entitled to disclose confidential information of the other to a third party to the extent that this is required by valid legal process, provided that (and without breaching any legal or regulatory requirement) where reasonably practicable a notice is provided in writing to the other party.

4.4. Maintenance of workpapers – Notwithstanding the above, we may keep one archival set of our working papers from the Engagement, including working papers containing or reflecting confidential information, in accordance with our internal policies.

**5. Termination**

5.2. Termination of Engagement with notice – Either party may terminate the Engagement Contract for whatever reason or for no reason upon written notice to the other party. Upon receipt of such

notice, we will stop all work immediately. You will be responsible for all fees and expenses incurred by us through the date termination notice is received.

5.3. Continuation of terms – The terms of the Engagement that by their context are intended to be performed after termination or expiration of this Engagement Contract are intended to survive such termination or expiration and shall continue to bind all parties.

**6. Indemnification and Liability Limitation; Waiver of Jury Trial**

6.1. Indemnification - You agree to indemnify and hold harmless Larx and any of its subsidiaries and affiliates, officers, directors, principals, shareholders, agents, independent contactors and employees (collectively "Indemnified Persons") from and against any and all claims, liabilities, damages, obligations, costs and expenses (including reasonable attorneys' fees and expenses and costs of investigation) arising out of or relating to your retention of Larx, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, except to the extent that any such claim, liability, obligation, damage, cost or expense resulted from the bad faith, self-dealing, gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted

6.2. Limitation of liability - You agree that no Indemnified Person shall have any liability as a result of your retention of Larx, the execution and delivery of this Engagement Contract, the provision of Services or other matters relating to or arising from this Engagement Contract, other than liabilities that shall have been determined by final non-appealable order of a court of competent jurisdiction to have resulted from the bad faith, self-dealing, gross negligence or willful misconduct of the Indemnified Person or Persons in respect of whom such liability is asserted.

6.3. WAIVER OF JURY TRIAL –TO FACILITATE JUDICIAL RESOLUTION AND SAVE TIME AND EXPENSE, YOU AND LARX IRREVOCABLY AND UNCONDITIONALLY AGREE NOT TO DEMAND A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THE SERVICES OR ANY SUCH OTHER MATTER.

**7. Governing Law and Jurisdiction-The Engagement Contract shall be governed by and interpreted in accordance with the laws of the State of Texas, without giving effect to the choice of law provisions thereof. The United States Federal Court sitting in the County of Dallas shall have exclusive jurisdiction in relation to any claim, dispute or difference concerning the Engagement Contract and any matter arising from it. The parties submit to the jurisdiction of such Courts and irrevocably waive any right they may have to object to any action being brought in these Courts, to claim that the action has been brought in an inconvenient forum or to claim that those Courts do not have jurisdiction.**

LARX ADVISORS, INC.

Mr. Michael Waters
July 31, 2019
Page 10

**Confirmation of Standard Terms and Conditions**

We agree to engage Larx Advisors, Inc. upon the terms set forth in these Standard Terms and Conditions as outlined above.

By: ____________________________
Mr. Michael E. Waters

Date: ____________________________